TAX COURT OF NEW JERSEY



Joshua D. Novin
Judge

Washington & Court Streets, 1ˢᵗ Floor
P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922, Ext. 54680
Fax: (973) 656-4305

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

December 21, 2018

Joseph A. Pojanowski, III, Esq.
Bertone Piccini LLP
777 Terrace Avenue, Suite 201
Hasbrouck Heights, New Jersey 07604

William R. Betesh, Esq.
Boggia & Boggia, LLC
71 Mt. Vernon Street
Ridgefield Park, New Jersey 07660

  Re: <u>R Realty LLC v. Little Falls Township</u>
     Docket Nos. 008007-2014, 000026-2015, and 000891-2016

Dear Mr. Pojanowski and Mr. Betesh:

This letter constitutes the court's opinion following trial in the above matters. Plaintiff, R Realty LLC ("R Realty"), challenges the 2014, 2015, and 2016 local property tax assessments on its improved property located in Little Falls Township ("Little Falls").

For the reasons stated more fully below, the court reduces the property's 2014 year tax assessment and affirms the property's 2015 and 2016 years tax assessments.

## I. <u>Procedural History and Findings of Fact</u>

R Realty is the owner of the real property and improvements located at 1615 State Highway Route 46 East, Little Falls, Passaic County, New Jersey. The property is identified on Little Falls' municipal tax map as Block 200, Lot 1 (the "subject property").[1]

---

[1] R Realty's expert's appraisal report identified the subject property as 1615-1625 State Highway Route 46 East, Little Falls, Passaic County, New Jersey.

The real property comprises a 4.51-acre, or 196,456 square foot, rectangular shaped parcel with approximately 305.46 feet of frontage along State Highway Route 46 East. As of the valuation dates, the real property was improved with two freestanding masonry and steel frame structures. The first structure consists of a 30,411 square foot Buick and GMC automobile dealership building, constructed in 1962, commonly known as McGuire Buick GMC (the "main building").[2] The second structure consists of a 7,896 square foot automobile dealership building, constructed in 1986 (the "auxiliary building"). As of the valuation dates at issue, the auxiliary building was not being used as an automobile dealership, however it formerly housed a Pontiac automobile dealership and service center.[3] For several years following General Motors cessation of automobile production of its Pontiac brand in 2010, the auxiliary building was used as McGuire Buick GMC's used car sales area.[4]

The subject property was acquired by R Realty from Argonaut Holdings, Inc., a subsidiary of General Motors, under deed dated December 27, 1999 for a reported consideration of $5,600,000. As part of the sale transaction, R Realty entered into a "Prime Lease" with Argonaut Holdings, Inc. for the subject property, who in turn subleased it to McGuire Auto Group, the entity operating the automobile dealership. The sublease agreement between Argonaut Holdings, Inc.

---

[2] In or about 2013, portions of the main building were re-imaged including replacement of the front exterior showroom/office area, addition of a drive-in service door, updating the customer service entrance, and modernization of the offices, new car showroom, and customer lounge.

[3] As of all valuation dates involved herein, the former service garage of the auxiliary building was being used an automobile detailing area for the dealership.

[4] The auxiliary building has not been utilized as the used car sales area since approximately 2012/2013. Interior photos of the auxiliary building's showroom and office area depict one automobile, and storage of a variety of office chairs and tables. However, the auxiliary building's former service area continues to be used by the automobile dealership as a vehicle detailing area and contains an automobile lift.

and McGuire Auto Group, provides that the dealer shall "actively and continuously" use the subject property "for the sale and service of Pontiac, GMC and Buick motor vehicles." According to the sublease, the subject property "may not be used for any purpose other than Dealership Operations . . . without the express written consent of Landlord [Argonaut Holdings, Inc.]. . . ."

The subject property is located in Little Falls' B-2 Highway Business District, permitting uses including retail establishments, shopping centers, hotels, motels, business and professional offices, banks without drive-in facilities, and fully enclosed eating and drinking establishments. A new car automobile dealership is a conditional use in the zoning district. The use of the subject property as an automobile dealership precedes adoption of the current zoning ordinance and therefore, is considered a legally permitted, pre-existing use. Five other new automobile dealerships are located within a two mile radius of the subject property.

Conflicting testimony was offered by the experts regarding the subject property's location in a flood hazard area. R Realty's expert opined that the subject property is located predominantly in the AE Flood Hazard Zone, denoting an area subject to a 1% annual chance of flooding[5], with the front portion being located in the X Flood Hazard Zone, denoting an area of minimal flood hazard risk. Conversely, Little Falls' expert opined that the subject property is located predominantly in the X Flood Hazard Zone, with only the rear portion of the subject property being located in the AH Flood Hazard Zone, denoting an area subject to inundation by a 1% annual chance of shallow flooding in average depths of between one and three feet.[6] The court finds, based on its review of the flood hazard maps, that the subject property is located predominantly in

---

[5] https://www.fema.gov/flood-zones (last visited December 21, 2018)

[6] https://www.fema.gov/flood-zones (last visited December 21, 2018)

3

the AE Flood Hazard Zone, with the front portion of the subject property being located in the X Flood Hazard Zone.

R Realty timely filed complaints challenging the subject property's 2014, 2015, and 2016 tax year assessments. Little Falls' timely filed a counterclaim for the 2016 tax year. The matters were tried to conclusion over several days.

During trial, R Realty and Little Falls each offered testimony from State of New Jersey certified general real estate appraisers, who were accepted by the court, without objection, as experts in the field of real property valuation (the "expert" or "experts"). Each expert prepared an appraisal report expressing an opinion of the market value of the subject property as of the October 1, 2013, October 1, 2014, and October 1, 2015 valuation dates.

As of each valuation date, the subject property's tax assessment, implied equalized value, and each expert's value conclusion is set forth below:

| Valuation date | Tax Assessment | Average ratio of assessed to true value | Implied equalized Value | R Realty's expert | Little Falls' expert |
|---|---|---|---|---|---|
| 10/1/2013 | $6,820,400 | 89.82% | $7,593,409 | $5,400,000 | $7,200,000 |
| 10/1/2014 | $6,820,400 | 90.34% | $7,549,701 | $5,400,000 | $7,200,000 |
| 10/1/2015 | $6,820,400 | 90.80% | $7,511,454 | $5,600,000 | $7,200,000 |

One of the central differences between the experts' opinions of value arose from their characterization of portions of the main building and auxiliary building as either "usable area[s]" or as "out of service space."

During trial, testimony was elicited from Ryan McGuire, a principal in both R Realty and McGuire Auto Group. According to Mr. McGuire's understanding of the franchise agreement and sublease agreement with Argonaut Holdings, Inc., certain restrictions are imposed on McGuire Auto Group's use of the subject property, and R Realty's ability to offer the property for sale. Mr. McGuire testified that the franchise agreement limits new automobile sales to General Motors

4

Buick and GMC brands, and the sale of any other new automobile brand must be expressly approved by General Motors. Mr. McGuire proffered that General Motors declined McGuire Auto Group's requests to use a portion of the subject property as a Hyundai or Subaru new automobile dealership. Additionally, Mr. McGuire offered testimony that based on his understanding of the Prime Lease, R Realty is prohibited from selling the subject property without the express consent of Argonaut Holdings, Inc.[7]

Mr. McGuire further expressed that prior to R Realty's acquisition of the subject property it experienced "environmental issues" and that "monitoring wells" are installed on the subject property, including a "water/oil separator well." As a result of those "environmental issues," McGuire Auto Group ceased using the former automated car wash located in the main building because the environmental consultant expressed concern that it could potentially impact the "environmental issues" on the subject property.

In R Realty's expert's opinion, the franchise agreement and sublease agreement are "a pretty strong encumbrance upon the property which results in certain external, maybe even functional obsolescence, which limits use of certain parts of the building." He further opined during trial that the sublease agreement affects the "functionality" of the auxiliary building, resulting in it being "diminished to the point of total inutility. The dealership chose to consolidate the car washing function to the rear of [the auxiliary building] structure to allow devotion of the [main] building to new car sales, service and support."

---

[7] The court was not furnished with the franchise agreement or a complete copy of the sublease agreement between McGuire Auto Group and Argonaut Holdings, Inc. Thus, it was not possible for the court to discern the accuracy of Mr. McGuire's understanding. However, the court's review of the Short Form of Prime Lease, annexed to R Realty's expert's appraisal report, disclosed that Argonaut Holdings, Inc. is afforded a "right of first refusal" to acquire the subject property if R Realty "desires to sell or transfer any of the property."

Thus, R Realty's expert posited that the main building should be divided into five areas: (i) a 4,712 square foot new car showroom, including executive and sales offices; (ii) a 5,061 square foot sales, customer lounge, office, and parts storage area; (iii) a 11,786 square foot automobile service area, including drive-thru; (iv) a 2,158 square foot "abandoned car wash area"; and (v) a 6,694 square foot automobile storage area. In addition, R Realty's expert offered that the auxiliary building should be divided into three areas: (i) a 3,000 square foot former automobile showroom; (ii) a 2,478 square foot former service/parts area; and (iii) a 2,418 square foot automobile detailing area.

Ultimately, R Realty's expert concluded that only 23,977 square feet of the main building and auxiliary building consisted of "usable area." He concluded that the remaining 14,330 square feet of the main building and auxiliary building suffered from economic/external obsolescence or functional obsolescence and was "out of service space." In his opinion, the 14,330 square feet was not capable of producing income. Thus, under his income capitalization approach to value, R Realty's expert attributed no rental income to the 14,330 square feet,[8] instead characterizing it as "out of service space" and including only its depreciated value under a cost approach.

Conversely, Little Falls' expert did not find that the subject property was impacted by either economic/external obsolescence or functional obsolescence. He submitted that the main building should be divided into four areas: (i) a 5,856 square foot two-story new automobile showroom-display area; (ii) a 1,760 square foot second floor office administrative area; (iii) a 11,837 square foot service and parts area; and (iv) a 10,958 square foot former body shop area, presently utilized

---

[8] R Realty's expert concluded that the main building's former automated car wash and automobile storage area were "out of service space" (8,852 square feet), and the auxiliary building's automobile showroom and service/parts area "were out of service space" (5,478 square feet) (8,852 + 5,478 = 14,330 square feet).

6

for automobile storage. In addition, Little Falls expert characterized the auxiliary building into two defined areas: (i) a 4,216 square foot automotive repair and automotive detailing area; and (ii) a 3,680 square foot former car showroom and mezzanine office area.

Little Falls' expert explained that the main building, including the automobile storage area and area occupied by the former automated car wash, "continue[s] to be served with electric[ity] and heat utilities."[9] Therefore, although those areas are not being fully utilized by the automobile dealership, the nonuse was the result of McGuire Auto Group's "business decision and not a determination as to the functional utility or viability of the space." Similarly, Little Falls' expert concluded that the auxiliary building was in "fair to average overall condition," and although it may suffer from deferred maintenance, requiring some repairs and cosmetic work, it is fully functional. In Little Falls' expert's opinion, limitations which may be imposed under the franchise agreement or sublease agreement, if any, were voluntarily limitations under a negotiated contract are not applicable to the determination of the subject property's market value. Accordingly, Little Falls' expert concluded that the entire 38,307 square feet of the main building and auxiliary building must be considered in determining the subject property's market value.

**II. Conclusions of Law**

A. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of

---

[9] Testimony was adduced from Mr. McGuire that the automobile storage area and former automated car wash area are serviced by electricity, utilities, and has or had a ceiling mounted heating unit. Additionally, Mr. McGuire offered that the lights in the car wash area are not operational simply because the lightbulbs needed to be changed. He further testified that the auxiliary building is completely serviced by utilities and is heated.

7

proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 174 (1952)). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the [challenging party] all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)). Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the challenging party has overcome the presumption of validity. If the court concludes that a challenging party has not carried the requisite

burden, dismissal of the action is warranted under R. 4:40-1 and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

According R Realty all reasonable and legitimate inferences which can be deduced from the evidence presented, the court concludes that R Realty produced cogent evidence sufficient to overcome the presumption of validity. If accepted as true, the opinions of R Realty's expert and the facts upon which R Realty's expert relied raise debatable questions regarding the correctness of the subject property's 2014, 2015, and 2016 tax year assessments.

However, concluding that the presumption of validity has been overcome does not equate to a finding that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of [the challenging party's] case-in-chief, the burden of proof remain[s] on the [challenging party] . . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15.

B. Highest and Best Use

In the court's pursuit to determine the market value of a property, consideration must be given to that price which a hypothetical buyer would pay a hypothetical seller, neither of which are constrained to purchase or sell the property, as of October 1 of the pretax year. See Petrizzo v. Edgewater Borough, 2 N.J. Tax 197, 200 (Tax 1981); Genola Ventures v. Shrewsbury Borough, 2 N.J. Tax 541, 551 (Tax 1981). An indispensable element of the property valuation process is discerning its highest and best use. Ford Motor Co., 10 N.J. Tax 153, 161. See also General

9

Motors Corp. v. Linden City, 22 N.J. Tax 95, 107 (Tax 2005). "For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Thus, the highest and best use analysis is often referred to as "the first and most important step in the valuation process." Ford Motor Co., 10 N.J. Tax at 161.

The highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000).

Here, both experts concluded that the as vacant highest and best use of the subject property was for commercial development consistent with the B-2 Highway Business District. However, recognizing that the subject property is currently improved with two freestanding masonry and steel frame structures, the experts' concluded that the highest and best use of the subject property as improved, is continuation of its current use as a new automobile dealership. The court finds the experts' opinions credible, the highest and best use of the subject property, as vacant, is for commercial development, and as improved, is for its current use as a new automobile dealership.

C. Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date,

10

applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)).

Although the experts considered all three valuation methods, R Realty's expert opined that the income capitalization and cost approach were the best methods to derive an opinion of market value for the subject property, according slightly more weight to the income capitalization approach.[10] Conversely, Little Falls' expert expressed that due to the presence of adequate market data on the sale of automobile dealerships, the comparative sales approach was the best method to derive an opinion of value for the subject property. Although Little Falls' expert also relied on the cost approach, he explained that he predominantly relied on the comparative sales approach.

For the reasons more particularly set forth herein, the court rejects R Realty's expert's income capitalization approach, and also rejects Little Falls' expert's comparative sales approach. Based on the record and evidence presented, the court will employ the cost approach to derive a market value for the subject property as of each valuation date.

1. Income Capitalization Approach

When a property is income producing, the income capitalization approach is the favored method for determining the estimated value of that property. Parkway Village Apartments Co. v.

---

[10] R Realty's expert's income capitalization approach was a hybrid of the income capitalization and cost approaches to value. He valued the 23,977 square feet of "useable area" under the income capitalization approach and then assigned a depreciated replacement cost value to the 14,330 square feet of "out-of-service area."

Cranford Twp., 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Princeton Borough, 16 N.J. Tax 68 (Tax 1996). "The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." Appraisal Institute, The Appraisal of Real Estate, 439 (14th ed. 2013). As Judge Hopkins succinctly stated, when deriving a value for property employing the income-capitalization approach:

> the gross rental value of the property is estimated. From the estimated gross rental there is deducted a factor for possible vacancies and collection losses. This results in effective gross income. Then all the expenses involved in running the property are subtracted, resulting in net income. Net income is the money which an investor could expect to receive through an investment in the property. It is computed into a value by means of a capitalization rate which embodies consideration of capital cost, remaining economic life of the property, and the degree of risk involved.
>
> [Lamm Associates v. West Caldwell Borough, 1 N.J. Tax 373, 377 (Tax 1980).]

Direct capitalization is a technique frequently employed by this court and valuation experts "to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate, at 491; Hull Junction Holding Corp., 16 N.J. Tax at 80-81. Thus, the capitalization rate is the device that converts a property's Net Operating Income into an estimate of value.

Central to the income capitalization approach is "the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments, 108 N.J. at 270. The term market rent refers to "the most probable rent that a property should bring in a

12

competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010).

Here, in performing his income capitalization approach, R Realty's expert identified five leases he considered reflective of market rent. Each lease was deemed reflective of market rent as of the October 1, 2013, October 1, 2014, and October 1, 2015 valuation dates. The leases bore commencement dates between April 2009 and January 2010, and ranged in leased area from 8,730 to 18,486 square feet.

R Realty's expert then applied a series of adjustments to the reported rental values to account for perceived differences in location (15%) and land-to-building ratio (-50% to 15%).[11] The location adjustments were based on differences in vehicular traffic between the subject property and the leased properties. The land-to-building ratio adjustments were intended to account for differences in the ratio of land area to improvement area of the subject property to the leased properties. According to R Realty's expert, automobile dealerships possessing more "available land . . . for customer parking, outside new and used car parking and display, deliveries and other related purposes," are superior to those possessing less of those features. The resulting range, per square foot, of unadjusted rents and adjusted rents for the leased properties are set forth as follows:

| Unadjusted rents | $15.95 - $27.30 |
| Adjusted rents | $13.65 - $20.90 |

---

[11] A condition adjustment was also made by R Realty's expert to lease 5. However, because the court struck consideration of lease 5, the court need not address R Realty's expert's condition adjustment.

Based on the foregoing, R Realty's expert concluded a market rent of $17.00 per square foot as of all valuation dates.

In order to compute his Gross Potential Income for each tax year, R Realty's expert applied his concluded market rent to the 23,977 square feet of "usable area."[12]  R Realty's expert then applied a vacancy and collection loss factor of 7%, per tax year, to compute his Effective Gross Income.  Next, R Realty's expert applied stabilized expenses for flood insurance, environmental monitoring, management, reserves, leasing expenses and professional fees to calculate the Net Operating Income.  In order to compute the subject property's market value, he applied an overall capitalization rate of 7.25% for the 2014 and 2015 tax years, and a capitalization rate of 7% for the 2016 tax year.  Next, to account for the 14,330 square feet of "out-of-service area," R Realty's expert added the depreciated replacement cost value of the 14,330 square feet, as determined under his cost approach, to the value derived under his income capitalization approach.  Finally, R Realty's expert added the cost of the 2013 re-imaging undertaken to the main building in order to reach his final value conclusion.

However, effective cross-examination disclosed that R Realty's expert's investigation, lease verification efforts, and data collection practices were flawed.  Admittedly, R Realty's expert did not review, examine, or inspect a copy of any lease agreement that he relied on in deriving his concluded market rent.  Additionally, lease 4 and 5 were revealed to be "rental offering[s]," and not consummated lease agreements.[13]  According to R Realty's expert, a "meeting of the minds"

---

[12]  R Realty's expert did not apply a market rent to the 14,330 square feet of "out-of-service area," instead assigning that area a depreciated replacement cost value.

[13]  The court struck consideration of lease 5, but did not bar consideration of lease 4, placing a statement of reasons on the record.  See Harrison Realty Corp. v. Harrison Town, 16 N.J. Tax 375 (Tax 1997), aff'd, 17 N.J. Tax 174 (App. Div. 1998).

14

was reached between the parties on the rent for lease 4, however due to the discovery of physical issues on the site, the lease was not fulfilled. Further examination disclosed that R Realty's expert was unaware whether a lease agreement was offered or executed, whether the physical issues were discovered before or after execution of a lease, whether lease negotiations continued despite the detection of physical issues, and what, if any, rent concessions were offered as a result of discovery of the physical issues. Accordingly, the court finds that R Realty's expert's lack of knowledge regarding key material aspects of the alleged "meeting of the minds" and status of the lease or lease negotiations regarding lease 4 renders it inherently unreliable evidence of market rent. See Korvettes Home Furnishing Center v. Elmwood Park Borough, 1 N.J. Tax 287 (Tax 1980) (concluding that "offers to rent do not assist in the search for fair market rental primarily because they represent only one half of the necessary equation. . . .").

Additionally, according to R Realty's expert, "[i]n order to realize a meaningful location comparison, the appraiser[] analyzed current New Jersey State Department of Transportation Interactive Traffic Count Reports. These studies and a review of the locations were used for [location] adjustment." However, the New Jersey Department of Transportation Traffic Count Reports apparently examined, reviewed, and relied on by R Realty's expert, as the foundation of his location adjustments, were neither reproduced in his appraisal report, nor were they produced during trial. Thus, the court was deprived of the ability to review the accuracy and integrity of the traffic information upon which the location adjustments were founded.

Significantly, cross-examination revealed that R Realty's expert could not identify the study area location that he employed as a basis for his comparison of lease 1 and 2 to the subject property. Additionally, R Realty's expert admitted that in making his comparisons and adjustments, he analyzed only the daily traffic studies of the eastbound traffic along State Highway

15

Route 46 and gave no consideration to the daily traffic studies of the westbound traffic along State Highway Route 46. According to the expert, he did not consider the daily studies of the westbound traffic because State Highway Route 46 is a divided highway and traffic would have to use a jug handle to access the subject property. However, R Realty's expert did not evaluate or consider the proximity of the closest jug handle along State Highway Route 46 westbound to the subject property, nor did he give any consideration to the visibility of the subject property from the westbound lanes of vehicular traffic. "The visibility of a commercial property from the street is an advertising asset. This asset is most valuable when the driving customer can easily exit the flow of traffic and enter the property." The Appraisal of Real Estate, at 210. Thus, when attempting to draw comparisons to and analyze the traffic studies of given locations, an appraiser must give a measure of consideration to the "turning movements of actual vehicles" and how those movements impact highest and best use, and correspondingly, a property's market value. Ibid.

Moreover, although R Realty's expert believed that he consulted traffic studies of only one direction of travel when the lease was located along a divided highway, because his report failed to contain the traffic studies forming the basis of his location adjustments, he was unable to affirmatively confirm his belief. As a result of R Realty's expert's failure to reproduce the traffic studies that formed the basis of his location adjustments either in his appraisal report, or during trial, the court was unable to verify the accuracy and integrity of those adjustments. Accordingly, for the above-stated reasons, the court finds that R Realty's expert's location adjustments to the comparable leases are not supported by credible and reliable evidence in the record. Therefore, the court rejects R Realty's expert's location adjustments for lease 1, 2, and 3.

Moreover, when performing his land-to-building analysis of the subject property to the leased properties, R Realty's expert acknowledged that he did not review the actual leases, relying

16

instead on information he was verbally told regarding their purported leased area. Although N.J.R.E. 703 permits an expert to base an opinion on "facts or data derived from. . . (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts in forming opinions on the same subject," the basis of the expert's opinion must be supported by credible factual evidence or other data. Creanga v. Jardal, 185 N.J. 345, 360-62 (2005). Here, R Realty's expert's failure to review the actual lease agreements, which form the basis of his land-to-building ratio adjustments raises material questions regarding the accuracy and integrity of the information and correspondingly, the analysis reported to the court.

Finally, testimony was elicited during trial that the property located at 108 Ridgedale Avenue, identified in R Realty's expert's report as lease 1 and 2, contained a site area significantly greater than what was reported in R Realty's expert's appraisal report. According to R Realty's expert's report, lease 1 was situate on a 1.21 acre site, and lease 2 was situate on a 2.47 acre site. However, testimony was elicited during trial that portions of that property are located both in the Town of Morristown and Morris Township, thereby containing a total land area of approximately 9.6043 acres. Thus, material questions exist with respect to the accuracy of R Realty's expert's data verification procedures and land-to-building ratio analysis and adjustments.

In sum, R Realty's expert's failure to review or inspect the leases and lack of credible support for his location and land-to-building ratio adjustments raises material doubts for the court regarding the accuracy and reliability of the market lease data, including R Realty's expert's credibility in selecting these leases as comparable and competitive with the subject property. It is well-settled that the weight to be accorded expert testimony "depends upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation. If the bases for the adjustments are not made evident the court cannot

17

extrapolate value." Inmar Associates v. Edison Twp., 2 N.J. Tax 59, 66 (Tax 1980) (internal citations omitted). Thus, in order for the opinion of an expert to be of any import, the expert is required to "identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992).

By failing to supply the court with the factual underpinnings of his location adjustments and failure to verify the accuracy and integrity of the lease information upon which R Realty's expert's land-to-building ratio adjustments were developed in determining market rent, the court is unable to accord his income capitalization approach any weight. "[W]hen an appraiser does not properly source, verify, and analyze that data and information to ensure the integrity of the opinions of value derived therefrom, those conclusions are not credible evidence of market rents." VBV Realty, LLC v. Scotch Plains Twp., 29 N.J. Tax 548, 567 (Tax 2017).

For the above stated reasons, the court accords R Realty's expert's income capitalization approach no weight.[14]

2. Sales Comparison Approach

In reaching his conclusion of value for the subject property, Little Falls' expert relied most heavily on the sales comparison approach. The sales comparison or comparative approach is predicated upon an evaluation of market transactions involving the recent sale of similar properties. This approach involves a "comparative analysis of properties" and requires the expert to focus on the "similarities and differences that affect value…which may include variations in property rights, financing, terms, market conditions and physical characteristics." The Appraisal

---

[14] Because the court finds R Realty's expert's income capitalization approach fatally flawed, the court need not address, at this time, R Realty's expert's conclusion that the subject property's improvements suffer from economic/external obsolescence and/or functional obsolescence.

of Real Estate, at 378. "When data is available, this [approach] is the most straightforward and simple way to explain and support an opinion of market value." Greenblatt, 26 N.J. Tax at 53 (internal citation omitted). A "major premise of the sales comparison approach is that an opinion of the market value of a property can be supported by studying the market's reaction to comparable and competitive properties." The Appraisal of Real Estate, at 377. Thus, the usefulness of the sales comparison approach is predicated on the sufficiency of the data on recent market transactions.

In the opinion of Little Falls' expert, the sales comparison approach was the most pragmatic method for deriving a value for the subject property because a market exists for automobile dealerships, and adequate sales data was readily available from which he could gauge similarities and differences, and discern an opinion of value.

Here, Little Falls expert provided the court with four sales of currently and formerly occupied automobile dealerships that he considered comparable to the subject property. The four dealerships were located in Essex County, Somerset County, and Monmouth County.

Improved sale 1, located at 1170 Bloomfield Avenue, West Caldwell, New Jersey, sold on December 4, 2007, for $6,700,000. This improved sale was occupied and the site of an existing operating Honda automobile dealership. The property consisted of two buildings, totaling 26,783 square feet, situated on a 4.40 acre lot. The sale reflected an unadjusted value of $250.15 per square foot.

Improved sale 2, located at 1051 State Highway 22, Bridgewater, New Jersey, sold on March 26, 2013, for $3,850,000. This improved sale was occupied and the site of a former Honda automobile dealership. The property is now being utilized as the site of a Volkswagen automobile

19

dealership. The property consisted of a 15,199 square foot one and part-story building, situated on a 2.4 acre lot. The sale reflected an unadjusted value of $253.31 per square foot.

Improved sale 3, located at 95 State Highway 36, Eatontown, New Jersey, sold on July 13, 2015, for $5,550,000. This improved sale was vacant at the time of sale and was the site of a former Chevrolet automobile dealership. The property consisted of two buildings containing approximately 26,571 square feet, situated on a 4.094 acre lot. The sale reflected an unadjusted value of $208.87 per square foot.

Improved sale four, located at 1155 Bloomfield Avenue, West Caldwell, New Jersey, sold on December 10, 2015, for $6,470,000. This improved sale was occupied and the site of an existing operating Toyota automobile dealership. The property consisted of two buildings containing approximately 33,688 square feet, situated on a 3.566 acre lot. The sale reflected an unadjusted value of $192.05 per square foot.

Little Falls' expert made adjustments to the improved sales for time (0% to -20%), traffic count (0% to 15%), lot size (0% to 10%), improvement size (0% to -10%), and condition (-15% to -25%). The resulting range of adjusted sales prices, per square foot, were $180.11 to $192.05, with a concluded value of $188.00 per square foot, for the 2014, 2015, and 2016 tax years.

However, the court finds that Little Falls' expert's sales comparison approach suffers from flaws rendering his conclusions unreliable in determining the subject property's market value.

At the outset, the court highlights that Little Falls' expert did not verify the terms of improved sale 3 with any transaction participant. Although testimony was offered that he attempted to verify improved sale 3 with transaction participants, he only communicated with the municipality's tax assessor regarding this sale. Our Legislature has mandated that, in Tax Court proceedings, any person being offered as a witness with respect to the review of a local property

20

tax assessment shall possess information or knowledge regarding the sale of comparable properties acquired from owners, sellers, purchasers, lessees, brokers or attorneys who were a party to, or participated in, the transaction. N.J.S.A. 2A:83-1. Specifically, N.J.S.A. 2A:83-1 requires that:

> in any action or proceeding in the Tax Court, any person offered as a witness in any such action or proceeding shall be competent to testify as to sales of comparable land, including any improvements thereon. . . from information or knowledge of such sales, obtained from the owner, seller, purchaser, lessee or occupant of such comparable land, or from information obtained from the broker or brokers or attorney or attorneys who negotiated or who are familiar with or cognizant of such sales, which testimony when so offered, shall be competent and admissible evidence in any such action or proceeding.
>
> [N.J.S.A. 2A:83-1.]

Here, Little Falls' expert did not verify with any transaction participant that improved sale 3 "reflected arms-length market considerations." The Appraisal of Real Estate, at 381. The sales comparison approach requires an appraiser "verify information with a party to the transaction to ensure its accuracy and gain insight into the motivation behind each transaction." Id. at 385. An appraiser must endeavor to confirm "statements of fact with the principals to the transaction . . . or with brokers, closing agents, or lenders involved." Ibid.

Because Little Falls' expert did not verify improved sale 3, and whether the transaction was impacted or influenced by unusual buyer or seller motivations, whether the buyer or seller were acting prudently, or whether unique or creative financing was involved in the transaction, the court finds that his reliance on improved sale 3, including any data or information extracted from that sale transaction is unproven and unreliable. See Venture 17, LLC v. Borough of Hasbrouck Heights, 27 N.J. Tax 108, 126 (Tax 2013) (citing Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 94 (Tax 1996)). Accordingly, for the above-stated reasons, the court accords Little Falls' expert's improved sale 3 no weight.

As a result thereof, the court must also reject Little Falls' expert's improved sale 1. In attempting to gauge the appropriateness of a time adjustment to improved sale 1, Little Falls' expert performed a paired sales analysis of improved sale 1 and improved sale 3. In his opinion, improved sale 1 and improved sale 3 bore similarities in location, lot size, building area, and condition and were only disparate on the sale date. Therefore, he concluded that a -20% adjustment was warranted to improved sale 1 to account for its sale date, approximately six years prior to the first valuation date involved in these tax appeals. However, without an adequate understanding and knowledge of whether improved sale 3 reflected an arms-length market transaction, any paired sales analysis that includes data or information extracted from such sale is similarly unreliable. For instance, if improved sale 3 did not reflect arms-length market considerations, then any paired sales analysis attempting to compute a time adjustment premised on improved sale 3's purchase price would be meaningless. Little Falls' expert's attempt to use improved sale 3 as a mechanism to compute the more than six year time adjustment to improved sale 1 renders the time adjustment imperfect and unreliable. Accordingly, without the ability to appropriately account for the time adjustment to improved sale 1, the court must reject improved sale 1.

In addition, for substantially similar reasons, the court must also reject Little Falls' expert's improved sale 2. In attempting to gauge the appropriateness of a building size adjustment to improved sale 2, Little Falls' expert performed a paired sales analysis of improved sale 3 and improved sale 4. Based on the size difference and sale price, per square foot, of improved sale 3 and improved sale 4, he computed a 12.68% difference, which he rounded to 10%. As a result of his computation, he adjusted improved sale 2 downward by -10%. However, as stated above, without an adequate understanding and knowledge of whether improved sale 3 reflected an arms-length market transaction, any paired sales analysis that includes data or information extracted

22

from improved sale 3 is unreliable.  For example, if improved sale 3 did not reflect arms-length market considerations, then any paired sales analysis attempting to compute a building size adjustment premised on improved sale 3 would be meaningless.  Little Falls' expert's attempt to use improved sale 3 as a mechanism to compute the building size adjustment to improved sale 2 renders the building size adjustment analysis imperfect and unreliable.  Accordingly, without the ability to appropriately account for the building size adjustment to improved sale 2, the court must reject improved sale 2.

Finally, although the court finds Little Falls' expert's adjustments for traffic count and condition to improved sale 4 are not unreasonable, it is the failure of Little Falls expert to analysis and account for the subject property's partial location in a flood hazard zone, which renders improved sale 4 unreliable evidence of market value.

As stated above, paramount to the sales comparison approach, an appraiser must conduct research of the competitive marketplace for "information on properties that are similar to the subject property" and that have recently sold.  The Appraisal of Real Estate, at 381.  One of the fundamental premises underlying the sales comparison approach is that "an opinion of the market value of a property can be supported by studying the market's reaction to comparable and competitive properties."  Id. at 377 (emphasis added).  Thus, the efficacy and suitability of the sales comparison approach is dependent upon the sufficiency of the data on recent market transactions and the appraiser's detailed examination, study, and analysis of that data.

Here, the court observes that improved sale 4 is of similar age, size, and lot size to the subject property.  However, unlike the subject property, no portion of improved sale 4 is located

within a flood hazard area.[15] Little Falls' expert offered no analysis or comparison to gauge the impact, if any, that an automobile dealership's location in a flood hazard area has in establishing market value. The sales comparison approach requires an appraiser to scrutinize and analyze the market's reaction to differences that exist in properties recently sold, and to make an adjustment, supported by market data, to account for those differences. Without knowing how the subject property's partial location in a flood hazard area impacts its market value, if at all, the court is unable to conclude that improved sale 4 is comparable to and competitive in the marketplace with the subject property.

Accordingly, for the above stated reasons, the court rejects Little Falls' expert's improved sales and his concluded value for the subject property under the sales comparison approach.

3. Cost Approach

The cost approach derives a property's value "by adding the estimated value of the land to the current costs of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation (i.e., deterioration and obsolescence) in the structures from all causes." The Appraisal of Real Estate, at 47. Thus, the cost approach consists of "two elements - land value and the reproduction or replacement cost of the buildings and other improvements." International Flavors & Fragrances, Inc. v. Union Beach Borough, 21 N.J. Tax 403, 417 (Tax 2004).

However, when site improvements are "considerably older or do not represent the highest and best use of the land as though vacant, the physical deterioration, functional obsolescence, and external obsolescence may be more difficult to estimate," rendering the cost approach a less

---

[15] Testimony was also elicited during trial that no portion of improved sale 3 was located in a special flood hazard area. However, no testimony or evidence was produced with respect to improved sale one or improved sale two's location in a special flood hazard area.

reliable indicator of market value. The Appraisal of Real Estate, at 567-568. Thus, the cost approach can sometimes be impractical, in attempting to value properties with "older improvements that suffer substantial depreciation, which can be difficult to estimate." Id. at 45.

Nonetheless, the cost approach is a particularly effective method of valuation when the property being appraised is new or when the site improvements are unique and designed for a special-purpose. Ibid. The cost approach is often the only reliable method of valuation of "special purpose or unique structures for which there is no market." Dworman v. Borough of Tinton Falls, 1 N.J. Tax 445, 452 (Tax 1980); Glenpointe Associates v. Teaneck Twp., 10 N.J. Tax 380, 388 (Tax 1989), aff'd, 12 N.J. Tax 118 (App. Div. 1990).

A special-purpose property is the type of property that "'cannot be converted to other uses without large capital investment,' such as a public museum, a church, or a highly-specialized production facility like a brewery." Ford Motor Co., 127 N.J. at 299 (quoting Sunshine Biscuits, Inc. v. Sayreville Borough, 4 N.J. Tax at 495 n. 3 (Tax 1982)); see also General Motors Corp. v. City of Linden, 22 N.J. Tax 95, 127 (Tax 2005). Generally, a special-purpose property possesses the following characteristics: "(1) unique and specially built for the purpose for which they are used, (2) without a market or comparable sales, (3) unlikely to be converted without substantial economic expenditure, and (4) reasonably expected to be replaced or reproduced if destroyed." TD Bank v. Hackensack City, 28 N.J. Tax 363, 379 (2015).

a. R Realty's expert

R Realty's expert identified six land sales he considered reflective of the subject property's land value. The six sale transactions took place between January 2011 and February 2015. Four of the sales were located in Bergen County, one was located in Morris County, and one was located in Essex County. Each of the land sales were deemed competitive and comparable for all three

valuation dates. The land sales ranged in size from 1.5 acres to 7.15 acres, and in unadjusted sale price from $9.32 to $46.36 per square foot, or $405,979 to $2,019,444 per acre.

R Realty's expert then applied a series of adjustments to the land sales to account for perceived differences in location (10% to 30%), land size (-30% to 20%), zoning (10%), and flood risk (-10%). The resulting range of adjusted values were $9.32 to $27.82, per square foot. R Realty's expert concluded a land value of $18.00, per square foot, or $784,080 per acre, and an overall land value of $3,536,000 ($18.00 x 196,456 square feet = $3,536,208) for the subject property during all tax years at issue.

In order to generate the replacement cost estimates for the improvements, R Realty's expert relied on the Marshall & Swift Valuation Service Cost Manual. R Realty's expert classified the main building into the following categories: (i) 4,712 square feet, good type, Class C automobile showroom; (ii) 5,061 square feet, average type, Class C customer lounge area; (iii) 11,083 square feet, average type, Class C automotive service center; (iv) 703 square feet, average type, Class C service center drive-thru; (v) 2,158 square feet, average type, Class C former automated car wash; and (vi) 6,694 square feet, average type, Class C automobile storage area. In addition, R Realty's expert classified the auxiliary building into the following categories: (i) 3,000 square feet, average type, Class C automobile showroom; (ii) 2,478 square feet, average type, Class C service area; and (iii) 2,418 square feet, average type, Class C vehicle detailing area. R Realty's expert ascribed an effective age of: (i) 20 years to the main building's showroom and customer lounge; (ii) 30 years to the main building's service garage and drive-thru; (iii) 35 years to the main building's former car wash area and vehicle storage area; and (iv) 35 years to the auxiliary building's showroom, service area, and automobile detailing area.

26

After determining the applicable unit cost and applying the appropriate multipliers, R Realty's expert concluded a total structure cost new, for the tax years at issue, of: (i) $936,164 to $971,161, for the main building showroom; (ii) $572,421 to $593,819, for the main building customer lounge; (iii) $1,139,571 to $1,182,171, for the main building service area; (iv) $72,284 to $74,986, for the main building service area drive-thru; (v) $246,407 to $255,618, for the main building former automated car wash area; (vi) $764,341 to $792,914, for the main building automobile storage area; (vii) $465,888 to $483,305, for the auxiliary building's showroom; (viii) $229,375 to $237,950, for the auxiliary building's service area; and (ix) $243,108 to $252,196, for the auxiliary building's automobile detailing area.

The expert then applied depreciation factors of between: (i) 23% to 24% to the showroom; (ii) 30% to 31% to the customer lounge area; (iii) 72% to 73% to the service garage and drive-thru; (iv) 80% to the former car wash area and vehicle storage area; and (v) 80% to the auxiliary building's showroom, service area, and automobile detailing area. The resulting depreciated reproduction costs ranged from $1,639,394 to $1,678,548 for the main building, and $180,599 to $187,350 for the auxiliary building.

In sum, R Realty's expert concluded a depreciated replacement cost value for the main building and auxiliary building of: (a) $2,245,000, as of the October 1, 2013 valuation date; (b) $2,290,000, as of the October 1, 2014 valuation date; and (c) $2,295,000, as of the October 1, 2015 valuation date.

To the depreciated replacement cost value of the main building and auxiliary building, R Realty's expert added his computed land value. This resulted in an overall value conclusion of: (a) $5,781,000 ($2,245,000 + $3,536,000 = $5,781,000), as of the October 1, 2013 valuation date; (b) $5,831,000 ($2,295,000 + $3,536,000 = $5,831,000), as of the October 1, 2014 valuation date;

27

and (c) $5,826,000 ($2,290,000 + $3,536,000 = $5,826,000), as of the October 1, 2015 valuation date.

### b. Little Falls' expert

In Little Falls' expert's opinion, the subject property is not a special purpose property. Thus, although he employed the cost approach, he accorded it a "limited supporting indication of value." In performing his cost approach, Little Falls' expert identified four land sales he considered reflective of the subject property's land value. The four transactions took place between July 2010 and November 2014. Two sales were located in Somerset County, one was located in Morris County and one was located in Essex County. The zoning district of each land sale permitted use of the property as an automobile dealership. Each of the sales were deemed competitive and comparable for all three valuation dates. The land sales ranged in size from 4.56 acres to 7.15 acres, and in unadjusted sale price from $17.66 to $24.87 per square foot, or $769,231 to $1,083,333 per acre.

Little Falls' expert then applied a series of adjustments to the land sales to account for perceived differences in traffic count (+15%) and land development approvals (-10%).[16] The resulting range of adjusted land values were $18.54 to $28.60, per square foot. Based on the foregoing, Little Falls' expert concluded a land value of $24.105, per square foot or $1,050,000 per acre, and an overall land value for the subject property of $4,735,000 ($24.105 x 196,456 square feet = $4,735,572, or $1,050,000 x 4.510 acres = $4,735,500 (rounded to $4,735,000)) for all tax years at issue.

---

[16] Little Falls' expert testified that he computed his traffic count adjustments based on New Jersey Department of Transportation traffic studies; and development approval adjustments based on a comparison of land sale 1 and land sale 4.

In order to generate the replacement cost estimates for the improvements, Little Falls' expert used the Marshall & Swift Valuation Service's "Commercial Estimator," an automated valuation software program. Little Falls' expert considered the main building to be in average to good overall condition and the auxiliary building to be in fair overall condition. Thus, he ascribed an effective age of 25 years to the main building and 30 years to the auxiliary building. However, instead of applying square foot measurements to the defined areas of the main building and auxiliary building, the automated valuation program permitted the expert to apply an estimated percentage to the improvement areas. Thus, Little Falls' expert estimated the automobile showroom occupied 25% of the main building; the service repair garage occupied 39% of the main building; and the automobile storage garage occupied 36% of the main building. Similarly, Little Falls' expert estimated the automobile showroom occupied 47% of the auxiliary building, and the service area/repair garage occupied 53% of the auxiliary building.[17] Further, under the automated valuation software program, Little Falls' expert assigned the main building and auxiliary building a "class" type of "C," and a "quality" factor of: (i) 3 to the main building's automobile showroom, (ii) 2 to the main building's service repair garage and storage garage; and (iii) 2 to the auxiliary building's automobile showroom and service repair garage. Based on the inputted information, the automated valuation software program produced total structure costs ranging between of $97.21 to $100.93 per square foot, for the estimated 30,411 square feet of the main building; and total structure costs ranging between of $110.10 to $114.30 per square foot, for the estimated 7,896 square feet of the auxiliary building. The resulting total reproduction costs ranged from $2,956,104 to $3,069,382 for the main building; and $869,378 to $902,537 for the auxiliary

---

[17] The "automobile showroom," "service repair garage," and "storage garage" descriptions assigned by Little Falls' expert were based on descriptions and occupancy codes designated under the Marshall & Swift Valuation Service's Cost Manual and selected by the expert.

29

building, for all tax years at issue. To this, Little Falls' expert applied a depreciation factor of 45.2% to the main building, and 64.9% to the auxiliary building. Finally, Little Falls' expert applied a positive entrepreneurial profit of 10%, to conclude a depreciated improvement value for the main building and auxiliary building of: (a) $2,420,000, as of the October 1, 2013 valuation date; (b) $2,479,000, as of the October 1, 2014 valuation date; (c) $2,660,500, as of the October 1, 2015 valuation date.

Significantly however, Little Falls' expert also used the "Marshall & Swift [Valuation Service Cost Manual] tables . . . as a limited check on the calculator cost program, the computerized cost printout" employed in his appraisal report for discerning a total reproduction cost for the subject property. He did this to "verify that the price per square foot that [he] was getting [under the cost manual] was similar . . . as the computerized version, just a check." Stated differently, Little Falls' expert expressed that he "did a double-check on the manual . . . to make sure [that the value derived from the automated valuation software program] was reasonable." The Marshall & Swift Valuation Service Cost Manual tables for automotive service centers, showrooms, service repair garages, storage garages, heating & cooling, and sprinklers, along with the current cost multipliers and local multipliers are contained in the appendix to Little Falls' expert's report.[18] Although only contained in in work file, Little Falls' expert offered testimony during trial that based on his cost calculation using the Marshall & Swift Valuation Service Cost Manual tables, the reproduction cost of the main building was: (i) $106.25 per square foot, for the 2014 tax year; (ii) $102.31 per square foot, for the 2015 tax year; (iii) $104.11 per square foot, for the 2016 tax year. In addition, the reproduction cost of the auxiliary building was: (i) $119.61 per

---

[18] The Marshall & Swift Valuation Service Cost Manual perimeter multiplier table and height multiplier table were not included in appendix of Little Falls expert's appraisal report.

square foot, for the 2014 tax year; (ii) $115.30 per square foot, for the 2015 tax year; and (iii) $116.20 per square foot, for the 2016 tax year.[19]

To the depreciated value of the replacement cost of the subject property's main building and auxiliary building, Little Falls' expert added his computed land value. This resulted in an overall value conclusion of: (a) $7,155,000 ($2,420,000 + $4,735,000 = $7,155,000), as of the October 1, 2013 valuation date; (b) $7,215,000 ($2,479,000 + $4,735,000 = $7,215,000), as of the October 1, 2014 valuation date; and (c) $7,395,000 ($2,660,500 + $4,735,000 = $7,395,000), as of the October 1, 2015 valuation date.

c. Conclusion

As recited above, the cost approach is a particularly effective method of valuation when the property being appraised is new or when the site improvements are unique and designed for a special-purpose. The Appraisal of Real Estate, at 45. Here, however R Realty's expert failed to present facts supporting his conclusion that the subject property is a special purpose building. The subject property is not uniquely constructed, possesses a comparable sales market, can be readily converted without great expenditure into an alternate commercial use, and would not be replaced if destroyed. See TD Bank v. Hackensack City, 28 N.J. Tax 363, 380 (Tax 2015); Willingboro Chrysler/Plymouth, Inc. v. Edgewater Park Twp., 6 N.J. Tax 168, 178 (Tax 1983). Evidence that these property types have a sales market is demonstrated by examining R Realty's expert's land sale 3, and Little Falls' expert's land sale 1, 3, and 4, all which were properties containing

---

[19] The court is satisfied that Little Falls' expert's testimony provided authentication and corroboration of the unit costs used by the automated software program based on his independent review and analysis of the Marshall & Swift Valuation Service Cost Manual and tables. See Forsgate Ventures IX, L.L.C. v. Twp. of South Hackensack, 29 N.J. Tax 28, 45 (Tax 2016); Palisadium Management Corp. v. Cliffisde Park Borough, 29 N.J. Tax 245, 263 (Tax 2016), aff'd, 456 N.J. Super. 293, 296-7 (App. Div. 2018).

automobile dealerships that were sold and repurposed or redeveloped. Although the subject property consists of components that provide a measure of utility as an automobile dealership, it cannot be said that the subject property is so uniquely designed and constructed that its utility is restricted to no other use. See General Motors Corp., 22 N.J. Tax at 127; Dworman v. Tinton Falls Borough, 1 N.J. Tax 445, 452 (1980), aff'd, 180 N.J. Super. 366 (App. Div. 1981); Palisadium Mgmt. Corp., 29 N.J. Tax at 260, aff'd, 456 N.J. Super. 293 (App. Div. 2018). Therefore, the court concludes that the subject property is not a special purpose property.

However, concluding that the subject property is not a special purpose property does not necessarily dictate that the cost approach be abandoned as a useful mechanism for deriving a property's market value. A cost approach that is well-balanced, adequately supported, and appropriately takes into consideration the effective age of a property's improvements can provide a meaningful estimate of market value. The court is mindful of its obligation "to apply its own judgment to [the] valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Associates v. Wall Twp., 99 N.J. 265, 280 (1985). Here, both expert's relied, in part, on the cost approach to derive their opinions of market value for the subject property.

The court begins its analysis of the experts' cost approach by highlighting that the depreciated replacement cost of the main building, auxiliary building, and site improvements, as computed by R Realty's expert and Little Falls' expert were very similar.

|  | 2014 | 2015 | 2016 |
|---|---|---|---|
| R Realty's expert | $2,245,000 | $2,295,000 | $2,290,000 |
| Little Falls' expert[20] | $2,200,000 | $2,252,000 | $2,420,000 |

---

[20] These amounts exclude Little Falls' expert's computation of entrepreneurial profit. After including entrepreneurial profit Little Falls expert's depreciated replacement cost new of the main building, auxiliary building, and site improvements was $2,420,000 for the 2014 tax year; $2,477,200 for the 2015 tax year; and $2,662,000 for the 2016 tax year.

The most significant disparity in the experts' conclusions of value under the cost approach arises from their land values. R Realty's expert opined that the subject property has a land value of $3,536,000, while Little Falls' expert opined that it has a land value of $4,735,000.

### 1. Land Valuation

The court finds that R Realty's expert's land sale 2, 3, 4, 5, and 6 are not credible evidence of market value. Moreover, the court finds that Little Falls' expert's land sale 1 and 2 are not credible evidence of market value.

R Realty's expert valued land sale 3 not based on the actual consideration paid, but rather on alleged appraised values of the property performed after the sale was effectuated and following demolition of the improvements and performance of environmental cleanup. Significantly, R Realty's expert did not review or possess a copy of the alleged appraisal reports, but rather accepted the statements of the buyer's attorney regarding what the reported appraised values of the property were. Therefore, the court finds R Realty's expert's reliance on and use of land sale 3 is materially flawed and does not accurately reflect market value.[21]

Additionally, R Realty's expert's location adjustments were based solely on traffic counts. According to R Realty's expert, he analyzed New Jersey State Department of Transportation traffic count reports. However, R Realty's expert produced only the New Jersey Department of Transportation traffic count for land sale 3. R Realty's expert did not produce either in his appraisal report or during trial, the New Jersey Department of Transportation traffic count reports for any other land sales. Thus, the court was deprived of the ability to review the accuracy and

---

[21] The court highlights that R Realty's expert's land sale 3 is identical to Little Falls expert's land sale 3. However, Little Falls expert employed the actual reported deed consideration and an estimate for demolition costs for the improvements, whereas R Realty's expert relied on after sale appraised values for the sale.

33

integrity of the traffic information upon which the location comparisons and adjustments were founded. R Realty's expert acknowledged that the traffic counts reported for land sales 3, 4, and 5 reflected two-way traffic, and land sales 1, 2, and 6 include only one-way traffic, as he utilized for the subject property.

Further, R Realty's expert gave no consideration to the proximity of the closest jug handle or U-turn along any of the divided comparable land sale roadways, nor for the subject property. As previously stated, "[t]he visibility of a commercial property from the street is an advertising asset. This asset is most valuable when the driving customer can easily exit the flow of traffic and enter the property." The Appraisal of Real Estate, at 210. When attempting to draw comparisons to and analyze the traffic studies of given locations, an appraiser must give a measure of consideration to the "turning movements of actual vehicles" and how those movements impact the highest and best use of a property, and correspondingly, its market value. Ibid. Because R Realty's expert failed to give any consideration to how the turning movement of the vehicular traffic may have impacted the values of the comparable land sales, the court finds that R Realty's expert's location adjustments are not adequately supported by market derived data, and therefore must be accorded no weight.

The court further finds that R Realty's expert offered no market derived support for his flood adjustment. According to R Realty's expert, "the subject is within a flood zone. An annual flood insurance cost is necessary. None of the other sales are so impacted, and have been adjusted downwards." Thus, R Realty's expert applied a -10% flood zone adjustment to land sales 2, 3, 4, 5, and 6, resulting in a downward value adjustment of between $78,000 and $670,000.[22] However,

---

[22] In his appraisal report R Realty's expert applied a -10% flood adjustment to land sale 1. However during trial he revealed that the -10% flood adjustment to land sale 1 was a typographical error and should have no flood adjustment.

R Realty's expert offered no clear market evidence to the court revealing that a -10% adjustment will accurately account for the subject property's presence, or partial presence, in a flood hazard area. In fact, if the court excluded the -10% flood adjustment to land sales 2, 3, 4, 5, and 6, then land sale 1 (the only land sale analyzed by R Realty's expert in a flood hazard area) would have a per square foot value of $21.20 which exceeds the average price per square foot of the remaining five land sales not impacted by flood.[23] Thus, the court finds that R Realty's expert failed to offer market derived support for his flood adjustment rendering it unreliable.

However, the court finds that it would be inappropriate to wholly disregard a property's location in a flood hazard area from consideration in attempting to fix the subject property's market value. Here, the court has found that the subject property is located predominantly in the AE Flood Hazard Zone, denoting a 1% annual risk of floodwaters impacting the property. Yet, without adequate reliable data extracted from the marketplace it is impossible for this court to gauge the true impact which a property's presence or partial presence in a flood hazard area has on value. As a result, the court concludes that R Realty's expert's land sales 2, 3, 4, 5 and 6, are not credible evidence of market value.

However, R Realty's expert's land sale 1 is located in a flood hazard area, and did not require an adjustment for either flood or location. Thus, the court accepts R Realty's expert's land sale 1, reflecting a value of $21.20 per square foot or $923,472 per acre, as evidence of market value.[24]

---

[23] Excluding R Realty's expert's -10% flood adjustment from land sales 2, 3, 4, 5, and 6 results in adjusted unit prices of $27.82, $27.96, $18.09, $10.25, and $20.41 per square foot, or an average of $20.91.

[24] During trial R Realty's expert explained that his appraisal report contained two errors with respect to land sale 1. The first, was based on an erroneous land size, and the second was that no flood adjustment was warranted. Thus, he concluded an adjusted value of $21.20 per square foot for land sale 1.

The court further finds that Little Falls' expert's land sale 1 is not credible or reliable evidence of market value. Cross-examination revealed that Little Falls' expert did not speak with any transaction participant with respect to land sale 1, relying instead only on his discussions with the municipal tax assessor. As stated above, N.J.S.A. 2A:83-1 requires that in local property tax appeal proceedings, any person being offered as a witness possess information or knowledge regarding the sale of comparable properties acquired from owners, sellers, purchasers, lessees, brokers or attorneys who were a party to, or participated in, the transaction. Here, because Little Falls' expert failed to confirm with a transaction participant that land sale 1 reflects an arms-length transaction, and is not impacted by unusual motivations or special factors, the court accords it no weight.

Moreover, the court finds that Little Falls' expert's land sale 2 is not credible or reliable evidence of the market value. Little Falls' expert did not know whether land sale 2 was wholly or partially located in special flood hazard area, and gave no consideration to this factor in making his adjustments. As stated above, a key aspect of the sales comparison approach requires an appraiser to conduct research of the competitive marketplace for "information on properties that are similar to the subject property" and that have recently sold. The Appraisal of Real Estate, at 381. An appraiser's opinion of the market value of a property can only be supported by "studying the market's reaction to comparable and competitive properties." Id. at 377. As Little Falls' expert offered little evidence of the impact that a location wholly or partially in a flood hazard area has on market value, the court finds that Little Falls' expert's land sale 2 is not comparable to, nor competitive with the subject property. Therefore, land sale 2 is not a reliable indicator of market value.

However, Little Falls' expert's land sale 3 and 4 are partially located in flood hazard areas and contain site features similar to the subject property. Therefore, the court accepts Little Falls' expert's land sale 3 and 4 as evidence of market value. As adjusted, land sale 3 reflects a value of $18.54 per square foot, or $807,693 per acre; and land sale 4 reflects a value of $28.60 per square foot, or $1,245,833 per acre.

Thus, utilizing R Realty's expert's land sale 1, and Little Falls' expert's land sale 3 and 4, the court derives a range of value of $18.54 to $28.60 per square foot, or $807,693 to $1,245,833 per acre. The three land sales have median value of $21.20 per square foot, and a mean value of $22.78 per square foot. The court concludes that a value of $22.50 per square foot, or a rounded figure of $980,000 per acre, is reasonable. Applying the concluded land value of $980,000 per acre to the subject property's 4.510 acres, the court concludes that the subject property has a land value of $4,400,000 for the 2014, 2015, and 2016 tax years.

## 2. Entrepreneurial Profit

Little Falls' expert added a 10% entrepreneurial profit to the depreciated value of the subject property's improvements, submitting that a 10% return was reasonable for these type of masonry and steel buildings constructed on the subject property. R Realty's expert applied no entrepreneurial profit to the depreciated value of the improvements. The court concludes that a 10% entrepreneurial profit is reasonable in this matter.

"Entrepreneurial profit reflects the difference between a property's total cost and its value after completion." Regent Care, 27 N.J. Tax at 150 (citing The Appraisal of Real Estate, at 388). Stated differently, it reflects "the entrepreneur's compensation for the risk and expertise associated with development." The Appraisal of Real Estate, at 388. However, the inclusion of entrepreneurial profit "is justified, even for an owner-constructed and owner-occupied building

37

because the principle of uniformity requires such property to be treated in the same manner as investment or speculation type property." Beneficial Facilities Corp. v. Peapack & Gladstone Borough, 11 N.J. Tax 359, 381 (Tax 1990). Thus, our courts have adopted the approach that entrepreneurial profit is a factor which should be considered in developing the market value of a property when "the developer or owner-operator makes improvements to property with the anticipation of realizing a profit on its subsequent resale." Westwood Lanes, Inc. v. Borough of Garwood, 24 N.J. Tax 239, 249 (Tax 2008) (citing Lawrence Assocs. v. Lawrence Twp., 5 N.J. Tax 481, 535 (Tax 1983)); see also American Cyanamid Co. v. Wayne Twp., 17 N.J. Tax, 542, 560-1 (Tax 1998), aff'd, 19 N.J. Tax 46 (App. Div. 2000).

Little Falls' expert testified that substantial amounts of time, energy, and effort would be devoted by either a developer or owner-occupier to oversee the construction of these type of commercial building or buildings, consisting of more than 38,000 square feet. In his estimate, a 10% entrepreneurial profit would reasonably account for those labors. The court accepts Little Falls' expert's 10% entrepreneurial profit calculation as reasonable.

### 3. Depreciation and Obsolescence

R Realty's expert applied depreciation rates ranging from 23% to 80%. In R Realty's expert's opinion, the main building's former automated car wash and automobile storage area, and the auxiliary building's automobile showroom, service area, and automobile detailing area all suffered from external/economic or functional obsolescence warranting an 80% depreciation factor. Specifically, R Realty's expert concluded that the franchise agreement and sublease agreement are "a pretty strong encumbrance upon the property which results in certain external, maybe even functional obsolescence, which limits use of certain parts of the building." He further expressed that the sublease agreement, affects the "functionality" of the auxiliary building

38

resulting in it being "diminished to the point of total inutility. The dealership chose to consolidate the car washing function to the rear of [the auxiliary building] structure to allow devotion of the [main] building to new car sales, service and support."

Conversely, Little Falls' expert applied depreciation rates of 45.2% to the main building and 64.9% to the auxiliary building. In Little Falls' expert's opinion, areas of both the main building and auxiliary building suffer from deferred maintenance, meaning that they required ordinary repairs or replacement, but were not rendered economically or functionally obsolescent.

### a. Economic/external obsolescence

External, or economic obsolescence, is "a loss in value caused by negative externalities, i.e., factors outside a property." The Appraisal of Real Estate, at 632. Stated differently, it is "the loss in value attributed to external influences allocated to the building improvements," such as adverse economic conditions. Id. at 633. This form of obsolescence can be either temporary or permanent. External obsolescence "usually has a market wide effect and influences a whole class of properties, rather than just a single property." Id. at 632. Factors outside of the property itself may include: "changes in population characteristics and economic trends, excessive taxes, and governmental restrictions." Transcontinental Gas Pipe Line Corp. v. Bernards Twp., 111 N.J. 507, 541 (1988).

When valuing real property, an appraiser must identify the interest or interests in the real property being valued. "It is axiomatic that for purposes of local real estate taxation in the State of New Jersey, land and improvements are to be assessed at their total full value and not just the interest of either a lessor or a lessee." Merchandise Mart Assocs. v. Pennsauken Twp., 3 N.J. Tax 275 (Tax 1981) (citing New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 544 (1963)). A lease is an economic interest dividing the fee simple interest of the property into partial interests

of the lessor and the lessee, which interests are governed by principles of contract law.  The Appraisal of Real Estate, at 70.  A negotiated lease agreement may contain terms or provisions that affect or impact the value of the leased fee or leasehold interest.  Thus, our laws require that for local property tax purposes the assessment must reflect a value "not of the owner's title, but of the land; the assessed value represents the value of all interests in the land." In re Appeal of Twp. of Neptune, 86 N.J. Super. 492, 499 (App. Div. 1965) (internal citation omitted).  Accordingly, an encumbrance on title, such as a restriction imposed under a lease or a deed "may not be considered in fixing the market value of the property. . . ." Id. at 500.  This principle must be contrasted with "governmental restrictions [that] may affect the value of real property for property tax purposes." Schwam v. Cedar Grove Twp., 9 N.J. Tax 406, 412 (Tax 1987).

In Prowitz v. Ridgefield Park Village, 237 N.J. Super. 435, 442 (App. Div. 1989), aff'd, 122 N.J. 199 (1991), our Appellate Division concluded that in fixing the local property tax assessment for low- and moderate-income housing units, their resale restriction is a factor that must be taken into consideration because it constitutes an encumbrance on the land, and not an encumbrance on title.  The court observed that an "encumbrance on the land . . . affects [the property's] use and disposition entirely apart from title considerations, characteristically including easements, restrictions and government regulations." Id. at 440.  An encumbrance on the land creates a "[b]urden[] on the land . . . which transcend[s] individual or particular ownership, [and] ordinarily have been required to be taken into account in assessing value." Ibid.  Conversely, an "encumbrance on title, such as a mortgage, a lease or a cloud, is typically a matter of temporary duration, of a 'curable' nature, personal to the owner, collateral to the use of the land itself and generally representative of the separate legal interests into which a single title may be divided." Ibid. (emphasis added).  An encumbrance on title does not "affect valuation for assessment

40

purposes because it is the whole title, and not just the partial interest which the taxpayer enjoys, which must be assessed." Ibid. (emphasis added).

Here, the court finds R Realty's expert's conclusion that the main building and auxiliary building suffer from economic/external obsolescence as a result of the contractual provisions of the franchise agreement and/or Prime Lease is misplaced. External, or economic obsolescence accounts for a "reduction in the value of property caused by factors extraneous to the property itself. . . ," including encumbrances on the land. Transcon. Gas Pipe Line Corp., 111 N.J. at 541. However, both the franchise agreement and the Prime Lease constitute voluntary contractual encumbrances on title, not encumbrances on the land and therefore, should not impact or affect the fee simple valuation of the subject property for local property tax assessment purposes. No evidence was presented that the value of the main building or auxiliary building were affected by easements, regulations, or governmental restrictions. Although some testimony was elicited during trial that the subject property suffered from a measure of environmental contamination and that monitoring wells were installed, neither R Realty's expert, nor Little Falls expert offered any evidence that the contamination impacted the subject property's market value.

Therefore, the court finds that R Realty's expert failed to offer credible and reliable evidence that the subject property suffers from economic/external obsolescence warranting application of an 80% depreciation factor.

b. Functional obsolescence

"Functional obsolescence is caused by a flaw in the structure, materials, or design of an improvement when the improvement is compared with the highest and best use and most cost-effective functional design requirements at the time of the appraisal. A building that was functionally adequate at the time of construction can become inadequate or less appealing as design

41

standards, mechanical systems, and construction materials evolve." The Appraisal of Real Estate, at 623. See also BASF Corp. Coating & Ink Div. v. Belvidere Town, 23 N.J. Tax 551, 571 (Tax 2007), aff'd, 24 N.J. Tax 416 (App. Div. 2009). Generally, functional obsolescence involves flaws and deficiencies that occur within the lot lines of the property, and thus, are within the control of the developer, owner, or occupant. Functional obsolescence, "may be curable or incurable, [and] can be caused by a deficiency – that is, some aspect of the subject property is below standard in respect to market norms." The Appraisal of Real Estate, at 623. "Whether the obsolescence is curable is important because curable obsolescence 'can be measured in terms of cost,' whereas incurable obsolescence 'must be estimated in terms of a percentage.'" Westwood Lanes, Inc., 24 N.J. Tax at 249 (citing RCA Corp. v. East Windsor Twp., 1 N.J. Tax 481, 502 (Tax 1980)). The test of curability for functional obsolescence is "simply a comparison of the value added to the improvement if the functional problem is corrected with the cost to cure the functional problem of that improvement." The Appraisal of Real Estate, at 625. If the value added by curing the functionality issue is "greater than the cost to cure, the function problem is curable." Ibid. Conversely, if "the value added is less than the cost to cure, the functional problem is incurable." Ibid.

"The test of curability for functional obsolescence caused by a deficiency is whether the cost to cure the item will result in a value increment equal to or greater than the expenditure, or allow existing items to maintain their value, then the item is considered curable." Regent Care, 27 N.J. Tax at 155. If the cost to cure the deficiency is less than or equal to the incremental increase in value that will result from making the expenditure, or will permit the existing improvements to retain their value, the item is considered curable. Conversely, if the cost to cure the deficiency

42

"will not result in a value increment greater than the loss in value caused by the item or building component, then the item is considered incurable." Ibid.

The court finds that R Realty's expert's conclusion that the main building's vehicle storage area and former automated car wash suffer from incurable functional obsolescence is flawed. In R Realty's expert's opinion, because these areas are not presently being used for the purposes that they were initially intended and the heating unit and lights in these areas were not operational, they suffer from functional obsolescence. However, testimony revealed that McGuire Auto Group continues to use these areas for storage and other purposes, and utilities are supplied to both areas. Additionally, no evidence was elicited from R Realty's expert regarding the estimated cost to cure the alleged functional obsolescence.

Moreover, testimony was elicited from Mr. McGuire that his facility repair personnel would often harvest parts from the heating units in these areas to replace broken or worn parts in heating units in other areas of the building, without having to incur the expense of buying new equipment or parts. Mr. McGuire further testified that if the lightbulbs and heating units were replaced, these areas would be furnished with all utilities necessary to be functional.

Thus, based on the record presented, the court finds that these areas of the main building suffer from deferred maintenance, requiring ordinary repairs and replacements. Accordingly, the court rejects R Realty's expert's testimony that the main building's automobile storage area and former automated car wash area suffer from functional obsolescence. The court finds the testimony of Little Falls' expert more credible in this regard, that the automobile storage area and former automated car wash suffer from deferred maintenance. Accordingly, the court finds that R Realty's expert failed to offer credible and reliable evidence warranting application of an 80% depreciation factor for functional obsolescence.

43

The court finds that Little Falls' expert's application of a 45.2% depreciation factor to the main building and a 64.9% depreciation factor to the auxiliary building, to be more reasonable and supported by the evidence in the record.

Accordingly, for the 2014 tax year, the court accepts Little Falls' expert's total depreciated value of the main building, including site improvements, of $1,895,000, entrepreneurial profit of $189,500, total depreciated value of the auxiliary building of $305,000, and entrepreneurial profit of $30,500, for a total replacement cost of $2,420,000. After adding the subject property's land value of $4,400,000, the court concludes a value for the subject property under the cost approach of $6,800,000 (rounded) for the 2014 tax year ($2,420,000 + $4,400,000 = $6,820,000).

For the 2015 tax year, the court accepts Little Falls' expert's total depreciated value of the main building, including site improvements, of $1,940,000, entrepreneurial profit of $194,000, total depreciated value of the auxiliary building of $312,000, and entrepreneurial profit of $31,200, for a total replacement cost of $2,477,200. After adding the subject property's land value of $4,400,000, the court concludes a value for the subject property under the cost approach of $6,900,000 (rounded) for the 2015 tax year ($2,477,200 + $4,400,000 = $6,877,200).

For the 2016 tax year, the court accepts Little Falls' expert's total depreciated value of the main building, including site improvements, of $2,105,000, entrepreneurial profit of $210,500, total depreciated value of the auxiliary building of $315,000, and entrepreneurial profit of $31,500, for a total replacement cost of $2,662,000. After adding the subject property's land value of $4,400,000, the court concludes a value for the subject property under the cost approach of $7,100,000 (rounded) for the 2016 tax year ($2,662,000 + $4,400,000 = $7,062,000).

44

Therefore, the court concludes a market value for the subject property of: (i) $6,800,000, as of the October 1, 2013 valuation date; (ii) $6,900,000, as of the October 1, 2014 valuation date; and (iii) $7,100,000, as of the October 1, 2015 valuation date.

D. Corrected assessment

Having reached a conclusion of the true or market value of the subject property, the court will determine the correct assessment for the 2014, 2015, and 2016 tax years. Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b). When the ratio of assessed value exceeds the upper limit or falls below the lower limit, the formula for determining the revised taxable value of property, under N.J.S.A. 54:51A-6(a), is as follows:

| True market value x Average ratio = Revised taxable value |
|---|

For the 2014 tax year, the ratio of total assessed value, $6,820,400, to true market value, $6,800,000, yields a ratio of 1.003% which exceeds the applied upper limit (1.0%) of the Chapter 123 common level range. Consequently, the calculation for the 2014 tax year is:

$6,800,000    x    .8982    =    $6,107,800 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject property for the 2014 tax year will be entered as follows:

| | |
|---|---|
| Land | $3,952,100 |
| Improvement | $2,155,700 |
| Total | $6,107,800 |

For the 2015 tax year, the ratio of total assessed value, $6,820,400, to true market value, $6,900,000, yields a ratio of .9885% which falls between the applied upper limit (1.0%) and lower limit (0.7679%) of the Chapter 123 common level range. Consequently, no reduction in the local property tax assessment is warranted for the 2015 tax year.

For the 2016 tax year, the ratio of total assessed value, $6,820,400, to true market value, $7,100,000, yields a ratio of .9606% which falls between the applied upper limit (1.0%) and lower limit (0.7718%) of the Chapter 123 common level range. Consequently, no reduction or increase in the local property tax assessment is warranted for the 2016 tax year.

### III. Conclusion

Accordingly, the court will enter a judgment reducing the subject property's 2014 local property tax assessment, and judgments affirming the subject property's 2015 and 2016 local property tax assessments.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.

46